STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-CV-15-41, *et seq.* ✓

In Re SIX CONSOLIDATED CASES    )
INVOLVING FLYNN, HOWANIEC,    )
LILLEY, TUCKER, and    )
TROUBH HEISLER PARTIES.    )
    )
    )

## ORDER ON ALL PENDING MOTIONS FOR SUMMARY JUDGMENT

There are presently six pending motions for summary judgment before the court in these six consolidated cases.

First, Troubh Heisler, P.A. ("TH" or "Troubh Heisler") moves for summary judgment on its breach of contract claim against Daniel G. Lilley, P.A. (the "Lilley firm") and John P. Flynn, III, Esq. ("Flynn" or "JPF") for a portion of the attorney's fee generated in the matter of *Estate of Nickerson v. Carter, et al.*

Second, TH moves for summary judgment on its breach of contract claim against the Lilley firm and Flynn for a portion of the attorney's fee generated in the matter of *Paige, et al. v. Maine Medical Center, et al.* TH also moves for summary judgment on James P. Howaniec, Esq.'s ("Howaniec") claim against TH for a portion of the attorney's fee generated in *Paige.*

Third, TH moves for summary judgment on its breach of contract claim against the Lilley firm and Flynn for a portion of the attorney's fee generated in the matter of *Estate of Braley v. Eastern Maine Medical Center, et al.*

Fourth, Richard D. Tucker, Esq. and the Tucker Law Group (collectively "Tucker") move for summary judgment on their claims against Daniel G. Lilley, Esq. ("Lilley") and the Lilley firm (collectively the "Lilley parties") for a portion of the attorney's fee generated in *Braley.*

1

Fifth, Flynn moves for summary judgment on his counterclaims against TH for breach of contract, fraud in the inducement, and unjust enrichment.

Sixth, Flynn moves for summary judgment on the Lilley parties' claims against him for portions of the attorney's fees generated in *Braley*, *Paige*, and *Nickerson*. Flynn also seeks summary judgment on his counterclaim against the Lilley parties for "fraud in the inducement."

Based on the entire record, the court decides the six motions as discussed below.

*I. Background*

Unless specifically noted, the following undisputed facts are taken from the parties' statements of material fact, the prior record in these matters, and the Law Court's decisions in *Tucker v. Lilley*, 2015 ME 36, 114 A.3d 201, and *Daniel G. Lilley, P.A. v. Flynn*, 2015 ME 134, 129 A.3d 936. All of the parties are licensed Maine attorneys or law firms organized under the laws of Maine.

Before 2009, Flynn was a director and shareholder of TH. TH's obligations to its shareholders were governed by its corporate bylaws as amended on November 9, 2004. In December 2007, Flynn and the other shareholders of TH executed a Stock Redemption Agreement (the "SRA"), effective January 1, 2008, which defined the terms and manner by which the firm would redeem the stock of any shareholder.

On January 1, 2009, Flynn informed the other directors he was leaving TH to join the Lilley firm. On January 31, 2009, Flynn and TH executed a separation agreement (the "SA") regarding Flynn's departure. Pursuant to the terms of the SA, Flynn officially resigned from TH on January 31, 2009.

When Flynn left TH, a number of clients chose to transfer their cases to the Lilley firm with Flynn. On February 5, 2009, TH, Flynn, and the Lilley firm entered into a Memorandum of Agreement (the "MOA") regarding the sharing of legal fees received from the cases that

were transferred from TH to the Lilley firm. The cases transferred from TH to the Lilley firm included the *Braley*, *Paige*, and *Nickerson* matters.

On January 17, 2009, Flynn and the Lilley parties entered into a Memorandum of Understanding (the "MOU"), which described the general terms of Flynn's employment with the Lilley firm. The MOU contained terms regarding Flynn's "Original Cases" that Flynn brought with him to the Lilley firm from TH. Flynn practiced law with the Lilley firm from 2009 until July 2011. He resigned from the Lilley firm on July 1, 2011, to open his own practice. Some of Flynn's clients again chose to leave the Lilley firm and keep their cases with Flynn.

A.     The *Paige* Matter

In 2002, Howaniec referred the *Paige* matter to William McKinley, Esq. at TH. TH agreed to pay Howaniec a 30% referral fee. Flynn later became the primary attorney on the *Paige* matter.

In 2010, while employed with the Lilley firm, Flynn successfully tried the *Paige* matter and obtained a jury verdict and judgment in favor of his client. The court approved a total attorney's fee of $172,906.86 for the *Paige* matter, which was collected by the Lilley firm. The Lilley firm paid Flynn $50,000.00 as compensation for the *Paige* matter.

In November 2011, TH filed a complaint against Flynn and the Lilley firm for breach of contract, seeking 33% of the *Paige* fee pursuant to the terms of the MOA. The Lilley firm filed a cross-claim against Flynn asserting that Flynn was obligated to pay TH. Flynn filed a cross-claim asserting that the Lilley firm was liable to TH and a counterclaim against TH asserting *inter alia* that TH had breached the SA and that TH had fraudulently induced Flynn to agree to the MOA. Howaniec filed a separate complaint in November 2011 against the TH, Flynn, and Lilley firm for a portion of the *Paige* fee. Flynn filed cross-claims against both the Lilley firm

3

and TH. TH filed a counterclaim for declaratory judgment against Howaniec. The Lilley firm also filed a cross-claim against Flynn and TH. Both matters regarding the *Paige* fee were consolidated by the court.

On August 24, 2014, the court (Wheeler, J.) entered summary judgment for TH in the amount of $57,059.26 plus interest and costs against the Lilley firm and Flynn, jointly and severally, and ordered Flynn's counterclaim be tried separately. The court also denied Howaniec's motion for partial summary judgment against the Lilley firm and Flynn.[1]

## B. The *Braley* Matter

In 2006, before Flynn's departure from TH, Tucker had brought the *Braley* matter to Flynn and asked him to become the lead counsel in the case. In September 2006, Tucker, Flynn, and their client entered into a fee-sharing agreement. Under the terms of the agreement, Tucker would receive 25% of any contingent fee earned in the *Braley* matter in return for his referral and continued involvement in the case (the "2006 Agreement"). The

---

[1] Unlike the prior summary judgment orders on the *Braley* fee and Flynn's claims against Lilley, Justice Wheeler's summary judgment orders regarding the *Paige* fee have not been vacated by the Law Court. TH asserts that the court should simply reaffirm Justice Wheeler's prior orders regarding the *Paige* fee. (TH Mot. Summ. J. *Paige* 1-2.) Essentially, TH is arguing that the court should adhere to the law of the case doctrine. In this context, the "law of the case" doctrine describes the "wise policy that a judge should not in the same case overrule or reconsider the decision of another judge of coordinate jurisdiction." *Blance v. Alley*, 404 A.2d 587, 589 (Me. 1979). In that regard, the "law of the case" doctrine is not a strict limit on the court's power. *Id.* It is merely an expression of "'the practice of courts generally to refuse to reopen what has been decided,...'" *Id.* (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

Although the Law Court's order did not address cases not before it, the Law Court directed the trial court to consolidate the disputes over attorney's fees and related claims so that common questions of law and fact could be decided in a single case, rather than piecemeal. Thus, the court has consolidated all six actions regarding the attorney's fees and related claims into this single action. To let Justice Wheeler's orders on the *Paige* matter stand, and for this court to decide the same common questions of law and fact only in regards to the *Braley* and *Nickerson* matters, would be inconsistent with the Law Court's directive that the cases be decided on a consolidated basis. Therefore, the court elects not to be bound by Justice Wheeler's order, and instead to decide the common questions raised by the motions for summary judgment in an order addressing all *Braley*, *Nickerson*, and *Paige* matters. This Order is consistent with Justice Wheeler's order, so the law of the case doctrine is not affronted.

4

existence and validity of the 2006 Agreement between Tucker, Flynn, and their client was affirmed by the Law Court in *Tucker v. Lilley.* 2015 ME 36, ¶ 18, 114 A.3d 201.

In June 2011, while still employed at the Lilley firm, Flynn successfully tried the *Braley* matter and obtained a jury verdict in favor of his client. The *Braley* matter did not resolve until a settlement was reached in April 2012 after Flynn had left the Lilley firm. The court approved a total attorney's fee of $1,240,000.00 for the *Braley* matter in April 2012. Pursuant to a court order and stipulations entered into by the client, Flynn, Lilley, TH, and Tucker, the $1,240,000.00 attorney's fee was placed in a special escrow account until division of the fee is resolved.

In February 2012, Tucker filed a complaint against the Lilley parties and Flynn seeking either a declaration that he is entitled to 25% of the entire *Braley* fee or a judgment for that amount. Lilley moved to consolidate Tucker's complaint with other cases regarding attorney's fees generated by Flynn's representation of Braley and other clients. The court (Wheeler, J.) denied the motion to consolidate. In July 2013, the court entered summary judgment for Tucker against Flynn and the Lilley parties. Following the voluntary dismissal of Flynn's cross-claim against the Lilley parties, the court entered final judgment pursuant to Maine Rule of Civil Procedure 54(b)(1).

In March 2012, TH filed a complaint against Flynn and the Lilley firm for breach of contract and seeking 20% of the *Braley* fee. The Lilley firm filed a cross-claim against Flynn asserting that Flynn was obligated to pay TH. Flynn filed a cross-claim asserting that the Lilley firm was liable to TH and a counterclaim against TH, asserting *inter alia* that TH had breached the SA and that TH had fraudulently induced Flynn to agree to the MOA. The Lilley parties moved to consolidate TH's complaint with other cases involving attorney's fees generated by Flynn. The motion was again denied (Wheeler, J.). After hearing, the court

entered an order granting summary judgment for TH in the amount of $248,000.00 plus interest and costs against the Lilley firm and Flynn, jointly and severally, dismissing Flynn's cross-claim against the Lilley parties, and severing Flynn's counterclaims against TH.

On March 25, 2015, the Law Court affirmed the entry of summary judgment for Tucker only as to Flynn. All other judgments and dispositions of claims in *Tucker v. Lilley et al.* and *Troubh Heisler, P.A. v. Daniel G. Lilley Law Offices, P.A. et al.* were vacated. The Law Court remanded the cases with orders that the matters be consolidated. *Tucker,* 2015 ME 36, ¶ 18, 114 A.3d 201.

## C.  The *Nickerson* Matter

In 2014, Flynn successfully negotiated a settlement in the *Nickerson* matter, which was approved by his clients. The court approved an attorney's fee of $78,625.00 for the *Nickerson* matter, which was collected by Flynn Law Offices, LLC.

In June 2015, TH filed a complaint against Flynn and the Lilley firm for breach of contract, seeking 20% of the *Nickerson* fee. The Lilley firm filed a cross-claim against Flynn asserting that Flynn was obligated to pay Lilley 75% of the fee recovered and was liable for any amounts owed to TH. Flynn filed a counterclaim against TH, asserting *inter alia* that TH had breached the SA and that TH had fraudulently induced Flynn to agree to the MOA. TH filed a counter-counterclaim against Flynn for declaratory judgment on issues raised by Flynn's counterclaim.

## D.  Lilley v. Flynn Claims

In September 2011, the Lilley parties filed a seven-count complaint against Flynn seeking *inter alia* a declaratory judgment that any fees earned in cases Flynn brought with him to the Lilley firm and cases that originated at the Lilley firm were property of the Lilley firm to be distributed solely at Lilley's discretion. The Lilley parties sought the return of any such fees

6

already received by Flynn. Flynn filed a counterclaim against the Lilley parties asserting *inter alia* that Lilley breached the terms of the MOU and that Lilley "fraudulently induced" Flynn to enter into the MOU. The court (Cole, J.) denied the Lilley parties' motion to consolidate this case with other cases concerning legal fees earned by the Lilley firm and/or Flynn.

On May 5, 2014, the court denied Flynn's motion for summary judgment on his counterclaims and granted summary judgment for the Lilley parties on most of Flynn's counterclaims except for breach of contract, *quantum meruit*, and unjust enrichment.[2] The case was then tried to a jury in May 2014. On October 20, 2015, the Law Court held the trial court's denial of the motion to consolidate was an abuse of discretion. *Daniel G. Lilley Law Office, P.A. v. Flynn*, 2015 ME 134, ¶ 18, 129 A.3d 936. Accordingly, the Law Court vacated the judgment and ordered that the case be consolidated with the other disputes regarding the attorney's fees. *Id.* Although the Law Court did not reach many of the parties' substantive arguments, in keeping with its practice of providing guidance to the trial court, the Law Court stated:

> The language of the MOA is simple and unambiguous. Its purpose and effect is to obligate Flynn and [the Lilley firm] to pay Troubh an agreed-upon referral fee in listed cases when either Flynn or [the Lilley firm] receives any legal fees in those cases. It is silent concerning how **Flynn** and [the Lilley firm] **are** to divide attorney fees **between themselves in those** cases after Troubh's referral fee is paid. Construing the MOA according to its plain language, it does not, and does not purport to, modify the MOU.

*Id.* (emphasis in original).

Pursuant to the Law Court's instructions, all six matters involving the Lilley parties, Flynn, TH, Tucker, and Howaniec were consolidated before the Business and Consumer Court.

---

[2] The Lilley parties argue that Justice Cole's prior decision constitutes the law of the case and bars Flynn from raising those same issues again. (Lilley Opp'n to Flynn Mot. Summ. J. 2-5); *see Blance*, 404 A.2d at 589 (stating the "law of the case" doctrine describes the "wise policy that a judge should not in the same case overrule or reconsider the decision of another judge of coordinate jurisdiction.") As discussed *infra*, Justice Cole's prior order was vacated by the Law Court. *Daniel G. Lilley Law Office, P.A. v. Flynn*, 2015 ME 134, ¶ 18, 129 A.3d 936. Therefore, it does not constitute the law of the case.

Pursuant to the court's November 9, 2016 scheduling order, the parties filed their motions for summary on or near December 12, 2016. Oppositions were filed on or near January 17, 2017, and reply memoranda on or near January 24, 2017. Oral argument on all pending motions for summary judgment was held February 10, 2017.

## II. Standard of Review

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. A fact is material if it can affect the outcome of the case. *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). A genuine issue of material fact exists if the fact finder must choose between competing versions of the truth. *Id.* When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

When a plaintiff moves for summary judgment on its claims, the plaintiff has the burden of establishing each element of its claim without dispute as to any material fact in the record. *Cach, LLC v. Kulas*, 2011 ME 70, ¶ 8, 21 A.3d 1015. If the plaintiff's motion for summary judgment is properly supported, the burden shifts to the defendant to respond with specific facts indicating a genuine issue for trial. M.R. Civ. P. 56(e). When a defendant moves for summary judgment and its motion is properly supported, the burden shifts to the plaintiff to respond with specific facts establishing a prima facie case for each element of the claim challenged by the defendant. M.R. Civ. P. 56(e); *Chartier v. Farm Family Life Ins. Co.*, 2015 ME 29, ¶ 6, 113 A.3d 234. In either case, if the non-moving party fails to present sufficient evidence of the challenged elements, the moving party is entitled to a summary judgment. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. Even if one party's version of the facts

8

appears more credible and persuasive, any genuine issue of material fact must be resolved by the fact finder, regardless of the likelihood of success. *Estate of Lewis v. Concord Gen. Mut. Ins. Co.*, 2014 ME 34, ¶ 10, 87 A.3d 732.

## III. *Analysis*

### A.  TH's Motions for Summary Judgment Against the Lilley Firm and Flynn

TH's three separate motions for summary judgment against the Lilley firm and Flynn address TH's claims under the MOA to the attorney's fees in the *Braley, Paige* and *Nickerson* cases respectively.  (TH Mots. Summ. J. *Braley* 8, *Paige* 2, *Nickerson* 1.)  TH asserts that the MOA is a binding contract, that its terms are unambiguous, that there is no genuine dispute of fact that the Lilley firm and/or Flynn have received a legal fee in each matter, that TH was entitled to a certain percentage of each legal fee as its referral fee under the MOA, that there is no genuine issue of fact that no payment has been made to TH on account of the *Braley, Paige,* or *Nickerson* matters, and that the Lilley firm and Flynn are jointly and severally liable for each referral fee. (*Id. Braley* 12, *Paige* 3, *Nickerson* 1.)

Flynn argues (1) that the MOA is unenforceable for lack of consideration or mutual obligations, (2) that the MOA is void because TH breached the SA and other oral promises with Flynn, which were conditions precedent to Flynn's performance under the MOA, and (3) that the MOA is void as to him for fraud in the inducement. (Flynn Opp'n *Braley* 9-15, *Paige* 9-15, *Nickerson* 9-16.)

The Lilley firm also asserts that the MOA is void as to it for fraud in the inducement. (Lilley Opp'n *Braley* 3-5, *Nickerson* 2-4.)

### 1.  The MOA is an enforceable and unambiguous contract.

To establish an enforceable contract, there must be sufficient evidence of (1) a meeting of the minds, (2) consideration, and (3) mutuality of obligations. *Dom J. Moreau & Son, Inc. v.*

9

*Fed. Pac. Elec. Co.*, 378 A.2d 151, 153 (Me. 1977). "A contract exists if the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite to enable the court to ascertain its exact meaning and fix exactly the legal liabilities of each party." *Sullivan v. Porter*, 2004 ME 134, ¶ 13, 861 A.2d 625. Generally, the existence of a contract is a question of fact. *Id.* An admission in a written contract that it was made for a valuable consideration is *prima facie* evidence of consideration. *Whitney v. Stearns*, 16 Me. 394, 396 (1839).

Flynn asserts that the MOA lacks consideration or any mutual obligations on the part of TH and that the court must look to the SA between TH and Flynn for TH's consideration. (Flynn Opp'n *Braley* 10-11, *Paige* 10-11, *Nickerson* 10-11.) Flynn asserts he agreed to the terms of the MOA in exchange for TH's promises under the SA. (*Id.*)

Contrary to Flynn's assertion, the MOA incorporates sufficient consideration and mutual obligations by all parties. The MOA expressly states:

> In consideration of the premises and the mutual benefits to be derived therefrom, the parties hereby sign this agreement on the dates indicated below,...

(TH Supp'g S.M.F. Ex. F.) This language is *prima facie* evidence of consideration. Moreover, the MOA contains valid consideration in the form of TH's promises to look to the legal fees received by Flynn and/or the Lilley firm as compensation for the TH firm's investment in the cases, thereby assuming the risk of receiving no compensation for these cases if Flynn and/or Lilley earned no legal fees.

As noted above, the Law Court in *Daniel G. Lilley Law Office, P.A. v. Flynn* has already decided that "the language of the MOA is simple and unambiguous. Its purpose and effect is to obligate Flynn and [the Lilley firm] to pay Troubh an agreed-upon referral fee in listed cases when either Flynn or [the Lilley firm] receives any legal fees in those cases." 2015 ME 134, ¶ 18, 129 A.3d 936. This constitutes the law of the case and will not be revisited by the court.

10

*See Blance v. Alley*, 404 A.2d 587, 589 (Me. 1979) ("absent a showing of essentially different facts, the decision by an appellate court on a given issue is to be followed in the trial court once the case is remanded").

The interpretation of an unambiguous contract is a question of law for the court. *Town of Lisbon v. Thayer Corp.*, 675 A.2d 514, 516 (Me. 1996). The court must give unambiguous contract terms their plain, ordinary, and generally accepted meaning. *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457. The MOA states, in pertinent part:

> For those clients whose cases are listed on the attached page who choose to have their cases transferred to Lilley with Flynn, it is the parties' intention that Flynn and Lilley will pay a referral fee to TH if and when legal fees are paid to Flynn and/or Lilley.
>
> For each such case, the referral fee paid to TH will be equal to the percentage of the total fees received by Flynn and or Lilley on that case. The percentage referral fee for each is listed in the right-hand column of the attached page.

(TH Supp'g S.M.F. Ex F.) According to the attached page, TH was to receive the following referral fees: 20% for the *Braley* matter, 33% for the *Paige* matter, and 20% for the *Nickerson* matter. (*Id.*)

The MOA unambiguously states that TH is to receive the stated percentages "of the **total fees received** by Flynn and or Lilley." (*Id.*) (emphasis supplied). Thus, under the unambiguous terms of the MOA, TH is entitled to the stated percentage of the total fees received by Flynn and/or the Lilley firm for *Braley*, *Paige*, and *Nickerson*.

Moreover, Flynn and the Lilley firm are jointly and severally liable under the MOA. "Joint and several liability may result when two or more parties are liable under a single contract,…" *Boisvert v. Boisvert*, 672 A.2d 96, 98 (Me. 1996). According to the Restatement, "Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and

11

several." Restatement (Second) of Contracts § 289 (1981). Here, the MOA unambiguously states:

> ... it is the parties' intention that **Flynn and Lilley will pay a referral fee to TH** if and when legal fees are paid to Flynn and/or Lilley.
>
> For each such case, the referral fee paid to TH will be equal to the percentage of the total fees **received by Flynn and or Lilley** on that case.

(TH Supp'g S.M.F. Ex F) (emphasis supplied). Flynn and the Lilley firm both have promised the same performance to TH. Therefore, both Flynn and the Lilley firm are liable to TH to the extent each has received the fees for *Braley, Paige,* and *Nickerson.* Clearly, issues remain for trial as to how payment of TH's percentage shares of the three fees will be allocated as between Flynn and the Lilley parties, but those do not affect TH's entitlement.

2.  Breach of the SA or other promises by TH does not vitiate Flynn's obligations under the MOA.

Flynn asserts that the MOA, the SA, TH's corporate bylaws, and oral promises constitute a single, integrated agreement. (Flynn Opp'n *Braley* 10, *Paige* 10, *Nickerson* 10-11.) Flynn asserts that TH's failure to pay Flynn his capital share value of approximately $30,000.00-$32,000.00 within ninety days of his departure, his attorney's fees collected after his departure, and his responsible attorney ("R/A") and originating attorney ("O/A") fees, in accordance with the SA, the bylaws, and oral promises was a breach of their agreement, rendering Flynn's obligations under the MOA void. (*Id. Braley* 11, *Paige* 11, *Nickerson* 11.)

According to the Restatement, a single contract exists where "every promise by one party is at least part of the consideration for every promise by the other party." Restatement (Second) of Contracts § 231 cmt. d. "But if one or more promises by each party are no part of the consideration for one or more promises by the other party, there are instead separate exchanges. In that case all of the promises on each side cannot be regarded as exchanged for all of those on the other side." *Id.* If there are two separate contacts, "even a total failure of

12

performance by one party as to the first has no necessary effect on the other party's duty to perform the second." *Me. Farmers Exch. v. Farm Credit of Me.*, 2002 ME 18, ¶ 16 n.10, 789 A.2d 85 (quoting Restatement (Second) of Contracts § 240 cmt. b).

The existence of a single contract or separate contracts is based on the parties' intent and the expectations of performance. *Id.* ¶ 16. As previously discussed, however, the court must give the terms of an unambiguous contract their plain, ordinary, and generally accepted meaning. *Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457. The court considers extrinsic evidence of the parties' intent, only if a contract is found to be ambiguous. *Id.* ¶ 10. Whether a contract is ambiguous is a question of law for the court. *Thayer Corp.*, 675 A.2d at 516.

Neither the SA nor the MOA is ambiguous. As previously discussed, there is no ambiguity in the terms of the MOA entered into by TH, Flynn, and the Lilley firm. The MOA is an enforceable agreement between the three parties. The court also finds no ambiguity in the SA between TH and Flynn. The SA contains an integration clause, which states:

10.     This Agreement, including the Memorandum of Agreement identified in paragraph 9 above, contains the entire agreement between TH and JPF in connection with topics set forth herein, and supersedes all prior agreements and negotiations between the parties.

(TH Supp'g S.M.F. Ex. D.) Because both agreements are unambiguous, the court need not look beyond their plain terms to determine whether they constitute a single contract or two separate agreements.

Although the SA expressly references and incorporates the MOA, the MOA makes no reference to the SA or any promises to Flynn under the SA. (*Id.* Exs. D & F.) Moreover, the MOA is a three-party agreement between TH, Flynn, and the Lilley firm. (*Id.* Ex. F.) The Lilley firm is not a party to and has made no promises under the SA. (*Id.* Ex. D.) The SA and the MOA also deal with distinct issues. The SA addresses Flynn's resignation from TH, his endorsement of his stock certificates, the delivery of Flynn's capital share, and other

13

employment and compensation issues related to Flynn's resignation from TH. (*Id.*) The MOA, on the other hand, concerns "the sharing of legal fees received on various personal injury, medical malpractice, and employee's workers' compensation matters, in contemplation of Flynn's departure from TH to work at Lilley." (*Id.* Ex. F.) Thus, based on the plain terms of both the MOA and the SA, there is no indication that every promise in the SA was consideration for every promise in the MOA or vice versa. Therefore, the MOA and the SA constitute separate, distinct agreements. Any breach of the SA by TH does not vitiate Flynn's obligation under the MOA.

3. The MOA is not void or voidable for fraud in the inducement as to either Flynn or the Lilley firm.

Fraud in the inducement is an affirmative defense that may vitiate the terms of a contract. *Kuperman v. Eiras*, 586 A.2d 1260, 1262 (Me. 1991). The party seeking to vitiate its assent to a contract bears the burden of establishing the elements of fraud by clear and convincing evidence: (1) that the opposing party made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it was true or false; (4) for the purpose of inducing the party to act in reliance upon it; and (5) the party justifiably relied upon the representation as true and acted upon it to their detriment. *Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280.

Fraud in the inducement may also be established by proof of fraudulent concealment, which requires proof that: (1) the opposing party failed to disclose; (2) a material fact; (3) where a legal or equitable duty to disclose the fact exists; (4) with the intention of inducing the other party to act or to refrain from acting in reliance on the non-disclosure; and (5) on which the other party, in fact, justifiably relied upon to their detriment. *Id.* Although extrinsic evidence is generally inadmissible to contradict an unambiguous agreement, a party may present

14

extrinsic evidence to demonstrate fraud in the inducement. *Harriman v. Maddocks*, 560 A.2d 11, 12 (Me. 1989).

Flynn asserts that he was induced into the MOA by TH's promises that he would receive between $30,000.00-$32,000.00 for his capital share within ninety days of his resignation and that he would receive O/A fees from any cases listed in the MOA that generated a windfall for TH. (Flynn Opp'n *Braley* 12-15, *Paige* 12-15, *Nickerson* 12-15.) Flynn also asserts that TH fraudulently concealed its intent to reduce his capital share. (*Id. Braley* 14, *Paige* 14, *Nickerson* 14-15.)

Regarding Flynn's capital share, Flynn asserts that, in December 2008 or January 2009, TH's President, Edwin A. Heisler, Esq., told Flynn that the value of his capital share was in the range of $30,000.00-$32,000.00. (Flynn Aff. ¶ 15.) Flynn asserts that TH failed to pay him his capital share within ninety days of his departure in accordance with the firm's bylaws. (*Id.* ¶ 16.) On June 23, 2009, Flynn received a check for $21,655.00 purporting to be the full reimbursement for his capital share. (*Id.* ¶ 17.) Regarding O/A fees, at his deposition, Flynn stated:

> Mr. Getchell told me specifically that I would be entitled, and I would be paid both OA and RA. And that conversation occurred in the context of me providing him with a first draft of the list of cases that was attached to the Memorandum of Agreement.
> And [Getchell's] response to the original percentages that were in there was, don't forget; you're entitled to RA and OA on these cases, and you should reconsider the amounts that are included on the cases attached to the MOA.
> And so I went back and, based upon that representation, did in fact change the percentages that were on that document with the case list.
> ... And I will also point out that if you look at that list of cases, there's a reason why there's a column that's entitled OA and indicates who the OA is on those particular cases.

(Flynn Dep. 35:3-25.)[3]

---

[3] Flynn also cites a January 27, 2009 email from himself to Getchell in support of his assertion that O/A fees were one of the criteria for setting the percentage owed to TH and that certain percentages

Flynn asserts that Heisler "had knowledge and information regarding the firm's finances and Flynn's capital shares as of the date he promised Flynn his share was valued at $30,000.00 - $32,000.00,..." (Flynn Opp. S.M.F *Braley* ¶ 11, *Nickerson* ¶ 11.) The only evidence cited by Flynn to support this assertion are a May 28, 2009 email from Heisler to other directors regarding capital accounts and disbursements and redacted minutes from various director's meetings, which occurred in March and May of 2009. (*Id.*; Flynn Ex. 13.) Neither piece of evidence demonstrates that Heisler knew in December 2008 or January 2009 the actual amount Flynn would receive for his capital share or that Heisler acted in reckless disregard for the truth. (Flynn Ex. 13.)

Moreover, if Heisler did tell Flynn in December or January, before the SA and MOA were signed, that Flynn's capital share was valued at $30,000 to $32,000, the range of dollar values makes it clear that Heisler was simply giving an estimate and not purported to fix the value of Flynn's capital share.

---

were increased based on Getchell's overtures regarding R/A and O/A fees to Flynn. (Flynn Opp. S.M.F. *Braley* ¶ 15, *Nickerson* ¶ 15; Flynn Add'l S.M.F. *Braley* ¶ 20, *Paige* ¶ 20, *Nickerson* ¶ 20.) Although the attachments to the email show that Flynn did increase several of the fees owed to TH, the text of the email does not necessarily support Flynn's assertion that the increase was done in response to Getchell's alleged representations regarding O/A fees due to Flynn. In the email, Flynn states:

> Basically, any case in which there is a **shared O/A, or which TH has invested sizeable costs/disbursements**, I have assigned a 33% fee to. In other cases, particularly med mal or P.I, and where there is little by the way of costs or disbursements, or in which there has been no other significant TH involvement, I have offered a 20% fee. Please remember in several of these cases I will also owe a referral fee to another attorney.

(Flynn Ex. 12) (emphasis supplied). Flynn's email goes on to explain the rationale for the referral fees in specific cases not at issue here. (*Id.*) Flynn's email does not mention O/A fees due specifically to him as a criterion for setting the percentage owed to TH. (*Id.*)

Flynn also cites an email exchange between Getchell and McKinley to support his assertion that he was "induced" to execute the SA and the MOA by certain promises regarding the sharing of fees. (Flynn Add'l S.M.F. *Braley* ¶ 15, *Paige* ¶ 15, *Nickerson* ¶ 15.) The email exchange cited by Flynn only refers to R/A fees. (Flynn Ex. 6.) In the email, Getchell states that a 50% R/A fee was due to Flynn on each referral fee received by TH, and that the R/A fee was explicitly discussed with Flynn "as an inducement to work out this deal." (*Id.*) The email exchange never discusses O/A fees due to Flynn. (*Id.*)

Further, Flynn's reliance on a conversation with Getchell as the basis for his claim to O/A fees is not justifiable. As previously discussed, the SA that Flynn and TH later executed contains an explicit integration clause, which states:

> 10. This Agreement, including the Memorandum of Agreement identified in paragraph 9 above, contains the entire agreement between TH and JPF in connection with topics set forth herein, and supersedes all prior agreements and negotiations between the parties.

(*Id.* Ex. D.)

The "topics set forth herein" were the terms of Flynn's separation from TH, so the integration clause explicitly supersedes any prior conversation or representation about those terms. Paragraph 4 of the SA states that TH will pay Flynn, in accordance with its bylaws, 50% of his collected R/A fees received after his departure. (TH Supp'g S.M.F. Ex. D.) The SA contains nothing that would entitle Flynn to O/A fees. (*Id.*)

Similarly, the MOA contains no references to O/A fees due to Flynn. (*Id.* Ex. F.) The only reference to "O/A" is a column included in the case list attached to the MOA that simply identifies the originating attorneys for the listed cases by their initials. (*Id.*) The inclusion of a column in an attached case list is not sufficient to create an ambiguity in the either the SA or the MOA, much less sufficient to create any right to O/A fees.

The conclusion that neither the SA nor the MOA confers any right to O/A fees upon Flynn is consistent with section 14(d) of TH's corporate bylaws, which provides:

> ...in the event of departure which is not due to malfeasance or misconduct, and which is due to death, disability, retirement, **or to pursue activities which do not involve the private practice of law in the State of Maine and which do not otherwise compete with the corporation,** such departing director,... shall also receive, as applicable the following:
>
> ....
>
> 2. With respect to any matter as to which the departing director, ... is the originating attorney, 25% of the amount by which any fees collected during the next ten calendar year following the year of departure exceeds the total value of billed time and expenses (the "windfall"), payable in the quarter such fees are collected. ...

17

3. . For purposes of this subparagraph d, departure to "pursue activities which do not involve the private practice of law in the State of Maine and which do not otherwise compete with the corporation" **shall be determined by the corporation in its sole discretion**...

(TH Supp'g S.M.F. Ex. A) (emphasis supplied). Corporate bylaws are interpreted using the same rules of construction as a contract. *See Lee v. Scotia Prince Cruises, Ltd.*, 2003 ME 78, ¶¶ 9-10, 828 A.2d 210. The interpretation of unambiguous bylaws is a question of law for the court. *Id.* ¶ 9. The court shall give unambiguous terms their plain, ordinary, and generally accepted meaning. *Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457.

Section 14(d) of TH's bylaws unambiguously states that a director who departs to engage in the private practice of law in competition with TH, is not entitled to O/A fees. (TH Supp'g S.M.F. Ex. A.) There is no genuine dispute of fact that Flynn left TH to engage in the private practice of law and in competition with TH. (TH Supp'g S.M.F. *Braley* ¶¶ 23-24, *Paige* ¶¶ 23-24, *Nickerson* ¶¶ 23-24.) Thus, Flynn is not entitled to O/A fees under the corporate bylaws.

Therefore, because the SA and the MOA contain the entire agreement between TH and Flynn and supersede all prior agreements and negotiations, and because TH's corporate bylaws expressly preclude Flynn from receiving O/A fees, it was not justifiable for Flynn to rely on a conversation with Getchell regarding O/A fees.

Regarding TH's intent to reduce his capital share, Flynn has put forth no facts demonstrating that TH concealed their intent to reduce his capital share during the negotiations of the SA or the MOA. Flynn's own statement of material facts state that it was only "[a]fter the agreements with Flynn concerning his departure were made" that Troubh Heisler President Edwin Heisler decided to re-calculate the value of Flynn's capital share. (Flynn Add'l S.M.F. *Braley* ¶ 21, *Paige* ¶ 21, *Nickerson* ¶ 21; Flynn Opp. S.M.F. *Braley* ¶ 17,

18

*Nickerson* ¶ 17.) Therefore, Flynn has failed to demonstrate that TH failed to disclose a material fact. Accordingly, the MOA is not void as to Flynn for fraud in the inducement.

The Lilley firm asserts that the MOA is void as to it for fraud in the inducement because TH concealed the facts that (1) TH owed a separate referral fee to Tucker from the *Braley* fee, and (2) TH was obligated to pay Flynn separate amounts from both the *Braley* and *Nickerson* fees. (Lilley Opp'n *Braley* 4-5, *Nickerson* 4.)[+] The Lilley firm asserts that TH knew of these facts and failed to disclose them, and had the Lilley firm been made aware, it would not have entered into the MOA. (*Id.*)

Fraudulent concealment can only be established where there is a legal or equitable duty to disclose a fact. *Barr*, 2012 ME 108, ¶ 16, 49 A.3d 1280. A duty to disclose exists only where there is a fiduciary or confidential relationship between the parties. *Brae Asset Fund, L.P. v. Adam*, 661 A.2d 1137, 1140 (Me. 1995). Generally, there is no fiduciary or confidential relationship between parties engaged in an arms-length, business transaction. *Eaton v. Sontag*, 387 A.2d 33, 37 (Me. 1978). Here, TH, the Lilley firm, and Flynn entered into a written agreement regarding the payment of referral fees to TH for the cases that were transferred from TH to the Lilley firm following Flynn's departure. (T.H. Supp'g S.M.F. *Braley* ¶ 29, *Nickerson* ¶ 27; Lilley Opp. S.M.F. *Braley* ¶ 29, *Nickerson* ¶ 27.) The Lilley firm has presented no facts establishing a fiduciary or confidential relationship between TH and the Lilley firm

---

+ Lilley did not file an opposition to TH's motion for summary judgment regarding the *Paige* fee. On January 17, 2017, Lilley sent an email to the court stating that, because the court (Wheeler, J.) had previously granted summary judgment for TH on the same grounds, Lilley would not oppose TH's new motion on the same grounds "with the understanding that Lilley is not waiving his objection to Troubh Heisler's request for summary judgment already entered in its favor" by Justice Wheeler and that Lilley would await final judgment to determine whether to appeal the order on the original motion for summary judgment in the *Paige* matter. (1/17/17 Lilley email.)

As indicated above in footnote 1, this Order does not treat Justice Wheeler's grant of summary judgment as establishing the law of the case. However, the court has considered Lilley's opposition to TH's motions in *Braley* and *Nickerson* in deciding the issue as to *Paige* also. Accordingly, Lilley's failure to oppose formally the *Paige* motion has not made any difference in outcome.

that would impose a duty to disclose TH's separate agreement with Flynn or the agreement with Tucker. Therefore, the MOA is not void as to the Lilley firm for fraud in the inducement.

4. There are no genuine issues of material fact for trial regarding Flynn and the Lilley firm's liability under the MOA.

To prevail on a breach of contract claim, a plaintiff must establish: (1) the parties had a legally binding contract; (2) the defendant breached a material term of the contract; and (3) defendant's breach caused the plaintiff to suffer damages. *Tobin v. Barter*, 2014 ME 51, ¶¶ 9-10, 89 A.3d 1088. As discussed above, TH, Flynn, and the Lilley firm entered into a binding agreement. The unambiguous terms of the MOA state:

> For those clients whose cases are listed on the attached page who choose to have their cases transferred to Lilley with Flynn, it is the parties' intention that Flynn and Lilley will pay a referral fee to TH if and **when legal fees are paid to Flynn and/or Lilley.**
>
> For each such case, **the referral fee paid to TH will be equal to the percentage of the total fees received by Flynn and or Lilley on that case.** The percentage referral fee for each is listed in the right-hand column of the attached page.

(TH Supp'g S.M.F. Ex F) (emphasis supplied). The attached page unambiguously states that TH is entitled to the following referral fees: (1) a 20% fee for the *Braley* matter, (2) a 33% fee for the *Paige* matter, and (3) a 20% fee for the *Nickerson* matter. (*Id.*)

With regard to the *Nickerson* fee, there is no dispute that the *Nickerson* case was settled and that Flynn received a total fee in the amount of $78,625.00. (TH Supp'g S.M.F. *Nickerson* ¶ 29; Flynn Opp. S.M.F. *Nickerson* ¶ 29; Lilley Opp. S.M.F. *Nickerson* ¶ 29.) There is also no dispute that TH has not received a referral fee for the *Nickerson* case. (*Id.* ¶ 32.) Similarly, there is no dispute that Flynn successfully tried the *Paige* matter and, after a verdict, received a

20

total fee in the amount of $172,906.86. (TH Supp'g S.M.F. *Paige* ¶ 30.)[5] There is also no dispute that TH has not received a referral fee for the *Paige* case. (*Id.* ¶ 33.) Accordingly, TH is entitled to summary judgment on its breach of contract claims regarding the *Nickerson* and *Paige* fees.

With regard to the *Braley* fee, both Flynn and the Lilley firm argue that neither of them has "received" a fee from the *Braley* matter because the attorney's fee from that case is presently held in the Lilley firm's escrow account. (Flynn Opp'n *Braley* 16; Lilley Opp'n *Braley* 6.) Thus, according to Flynn and the Lilley firm, there has been no breach of the MOA regarding the *Braley* fee. However, the MOA says "Flynn and Lilley will pay a referral fee to TH if and when legal fees **are paid** to Flynn and/or Lilley" (emphasis added). It is crystal-clear that the *Braley* fee has been paid to and received by the Lilley firm for purposes of the MOA, regardless of the fact that the firm has agreed to place the funds representing the fee in its escrow account. Flynn's share of the fee will be paid to him after judgment, at which point any payment due from his share to TH becomes immediately due. Because the MOA calls for TH to be paid when either Flynn or the Lilley firm is paid, and because the *Braley* fee has been paid to the Lilley firm, the argument that the fee has not been "received" is without merit.

Flynn also argues that because he also entered into a referral fee agreement with Tucker regarding the *Braley* case, Tucker's 25% referral fee must be deducted from the total fee before he and/or the Lilley firm "receive" their fee for the *Braley* case. (Flynn Opp'n *Braley* 16-17.) Thus, according to Flynn, TH is owed only 20% of the remaining fee from the *Braley* case. (*Id.*) Similarly, the Lilley firm argues that there are genuine issues of material fact regarding

---

[5] Flynn's opposing statement of material facts regarding the *Paige* fee filed with the court did not include any response to TH's statements of material fact ¶¶ 14-34. *See* (Flynn Opp. S.M.F. *Paige.*) Therefore, those statements of material fact by TH that are properly supported shall be deemed admitted. M.R. Civ. P. 56(h)(4).

the amount the Lilley firm and/or Flynn will "receive" if Tucker's referral fee is paid first. (Lilley Opp'n *Braley* 7.)

The Law Court has already affirmed that Tucker is entitled to 25% of any contingent fee earned in the *Braley* matter from Flynn under Flynn and Tucker's separate fee-sharing agreement entered into with their client. *Tucker*, 2015 ME 36, ¶ 18, 114 A.3d 201. The MOA is a separate, enforceable agreement between Flynn, the Lilley firm, and TH. `The MOA unambiguously states, "...the referral fee paid to TH will be equal to the percentage of **the total fees received** by Flynn and or Lilley on that case." (TH Supp'g S.M.F. Ex. F.) Tucker's percentage therefore applies to the total 40% contingent fee awarded to Flynn. (TH Supp'g S.M.F. *Braley* ¶ 31, Exs. G-H; Flynn Opp. S.M.F. *Braley* ¶ 31; Lilley Opp. S.M.F. *Braley* ¶ 31.)

The fact that TH, Tucker, Flynn, and the Lilley firm all consented to the placement of the $1,240,000.00 contingent fee in an escrow account during the pendency of this action does not change the undisputed fact that the court ordered the payment of the fee to Flynn. (*Id.* ¶¶ 31-32; TH Supp'g S.M.F. Exs. G-H.) Thus, the "total fee received" for the *Braley* case was $1,240,000.00. Under the unambiguous language of the MOA, TH is entitled to 20% of that total fee. TH's entitlement to 20% of the total *Braley* fee recoverable from the Lilley firm and/or Flynn is separate from and concurrent with Tucker's entitlement to 25% of the total *Braley* fee. There is no dispute that TH has not received a referral fee for the *Braley* case. (*Id.* ¶ 38.) Accordingly, TH is entitled to summary judgment on its breach of contract claim regarding the *Braley* fee.

TH is entitled to summary judgment against Flynn and the Lilley firm, on TH's breach of contract claims in the following amounts: (1) $248,000.00 for the *Braley* matter, (2) $57,059.25 for the *Paige* matter, and (3) $15,725.00 for the *Nickerson* matter, plus interest on each.

22

**B.      Howaniec's claim against TH for a portion of the *Paige* fee**

TH has also moved for summary declaratory judgment against Howaniec on his claim for a portion of the *Paige* fee. (TH Mot. Summ. J. *Paige* 1.) TH does not dispute that it entered into a referral fee agreement with Howaniec regarding the *Paige* matter. (*Id.* at 5.) TH asserts that Howaniec is entitled to 30% of TH's net receipt on account of the *Paige* matter, subject to the common fund doctrine. (*Id.*) TH asserts that, under the common fund doctrine, Howaniec is only entitled to 30% of what TH recovers after it pays its counsel's one-third contingent fee. (*Id.* at 6.) In opposition, Howaniec asserts that the common fund doctrine does not apply to this dispute and that he is entitled to receive 30% of the total fee received by TH. (Howaniec Opp'n *Paige* 2-4.)

In general, the common fund doctrine applies to prevent unjust enrichment in situations in which two or more parties have claims against the same third party, but fewer than all claimants have borne the cost of litigating the claims of all claimants and obtaining recovery for the benefit of all claimants. *See* 32B Am Jur. 2d Federal Courts § 1939. Thus, when an injured plaintiff and the plaintiff's subrogated insurer both have claims against a tortfeasor, the common fund doctrine may require the subrogated insurer to contribute to the attorney fees and costs associated with obtained recovery for the benefit of both the injured plaintiff and the insurer. Similarly, in class action cases in which a class representative plaintiff obtains recovery for the claims of all class members against the same defendant, the other class members may be required to contribute to the cost incurred by the class representative in pursuing the claims of the class.

The Law Court has not applied the common fund doctrine outside the context of insurance subrogation. *York Ins. Grp. v. Van Hall*, 1997 ME 230, ¶ ¶ 4-5, 704 A.2d 366; *Estate of Weatherbee*, 2014 ME 73, 93 A.3d 248; *Doucette v. Pathways, Inc.*, 2000 ME 164, 759 A.2d 718.

23

This is not a subrogation case—unlike a medical insurer that has paid its insured's medical bills and therefore stands in the shoes of its insured vis-a-vis the tortfeasor, Howaniec does not stand in TH's shoes as to the Lilley parties and/or Flynn. Howaniec's recovery depends on whether he prevails on his claim against TH. Howaniec has been separately represented in this case. The fact that TH does not dispute Howaniec's claim (except to the extent TH has invoked the common fund doctrine), and the fact that TH has had to sue the Lilley parties and Flynn to gain its share of the fees in all three underlying cases do not necessarily mean that Howaniec has been unjustly enriched. *See Tribuilt Constr. Group, LLC v. Int'l Fid. Ins. Co.*, 2010 U.S. Dist. LEXIS 112498 at *7-*12 (W.D. Ark 2010) (summary judgment granted to surety on general contractor's common fund claim).

On the other hand, the facts of Howaniec's claim do bear some resemblance to common fund cases—Howaniec did assert claims directly against the Lilley parties and Flynn despite not having any contract with them, so TH can claim to have been litigating on his behalf as well as on its own behalf. Accordingly, the court will deny TH's summary judgment claim but will not render summary judgment against TH on this issue, thereby leaving the common fund issue as between TH and Howaniec for a later determination. Howaniec's claim to 30% of the *Paige* fee equates to about five percent of the approximately $320,000 in fees that TH claims against Flynn and the Lilley parties, so any obligation he may have to contribute to TH's attorney fees should be correspondingly limited, if not vanishingly small.

## C.    Tucker's Motion for Summary Judgment Against the Lilley Parties

Tucker has moved for summary judgment on his claims against the Lilley parties for a portion of the *Braley* fee. (Tucker Mot. Summ. J. 1.) Tucker initially brought claims against both Flynn and the Lilley parties. In *Tucker v. Lilley*, the Law Court affirmed summary judgment on Tucker's claims against Flynn. 2015 ME 36, ¶ 18, 114 A.3d 201. The Law Court

found that there was no dispute that Tucker, Flynn, and their client had entered into the 2006 Agreement, that "Tucker was to receive 25% of any contingent fee earned in the Braley matter," and that those facts were established as to Flynn. *Id.* ¶ 12. Those issues have been expressly decided and constitute the law of the case in this action. *See Blance*, 404 A.2d at 589 ("absent a showing of essentially different facts, the decision by an appellate court on a given issue is to be followed in the trial court once the case is remanded").

Regarding Tucker's claims against the Lilley parties, however, the Law Court held that there were genuine issues of fact regarding (1) whether, when Flynn joined the Lilley firm, the Lilley parties also agreed to pay Tucker a fee, and (2) if the Lilley parties did agree, whether they agreed to a 25% fee or a lesser amount. *Tucker*, 2015 ME 36, ¶ 14, 114 A.3d 201.

In his present motion, Tucker argues that he is entitled to summary judgment against the Lilley parties and immediate payment because the validity of the 2006 Agreement and his entitlement to 25% of the escrowed funds has already been determined by the Law Court. (Tucker Mot. Summ. J. 7-13.) Tucker's argument, however, is contrary to the Law Court's express holding in *Tucker v. Lilley*. The Law Court stated the validity of the 2006 Agreement and Tucker's entitlement to 25% of the fee from *Braley* were established only as to Flynn. *Tucker*, 2015 ME 36, ¶ 12, 114 A.3d 201. The Law Court expressly stated, "The same result does not follow concerning Tucker's separate claim against [the Lilley parties], however, because, notwithstanding the established fee-sharing agreement between Tucker and Flynn, a genuine dispute of material fact remains..." *Id.* ¶ 14. The Law Court further stated:

> Finally, to the extent that the court's judgment against Flynn may suggest that Tucker is entitled to immediate payment from the attorney fees held in escrow, we make clear that these actions are not in rem proceedings against the money held in escrow. Rather, they are disputes arising from a series of contracts that may—or may not—be related to each other. The escrowed proceeds may—or may not—be sufficient to satisfy any liabilities created by the judgments to be entered in these actions.

25

*Id.* ¶ 18.

Admittedly, the Law Court was addressing a different record than that now before this court. However, the genuine issues of material fact identified by the Law Court have not been resolved on the present record. Both Tucker and the Lilley parties agree that, following Flynn's move to the Lilley firm, Ms. Braley entered into a contingency fee agreement with the Lilley firm in April 2010. (Tucker Supp'g S.M.F. ¶ 16; Lilly Opp. S.M.F. ¶ 16.) The 2010 contingency fee agreement does not mention Tucker or the 2006 Agreement. (*Id.* ¶¶ 17-18.) The Lilley parties assert that Lilley was never aware that a referral fee was owed to Tucker. (Lilley Add'l S.M.F. ¶ 1.) Because those genuine issues of fact remain, Tucker's motion for summary judgment against the Lilley parties must be denied.

**D.    Flynn's Motion for Summary Judgment against TH**

Flynn has filed counterclaims against TH in each of the suits initiated by TH. In each case, Flynn asserts claims for breach of contract, fraud in the inducement, and unjust enrichment. (Flynn Mot. Summ. J. 2.) Flynn now seeks summary judgment against TH on all of his counterclaims. (*Id.*) Flynn asserts that TH breached the SA and the firm's bylaws by (1) failing to pay Flynn his capital share with ninety days as required by the firm's bylaws, and by (2) failing to pay Flynn the full value of his capital share. (*Id.* at 10.) Flynn again asserts that these breaches of the SA vitiate his obligations under the MOA and that he is entitled to damages. (*Id.* at 12.) Flynn also asserts again that he was induced to enter into both the SA and the MOA by Heisler's alleged statement that Flynn would be paid between $30,000.00-$32,000.00 for his capital share within 90 days of his departure and Getchell's alleged statements that Flynn would receive O/A fees from any windfalls to TH, and that TH fraudulently concealed its intent to reduce his capital share. (*Id.* at 13-16.) Flynn's motion does not address his counterclaim for unjust enrichment.

26

1.    Neither the MOA nor the SA is void or voidable for fraud in the inducement.

As discussed above, fraud in the inducement is an affirmative defense for the purpose of justifying the avoidance or rescission of a contract and is not a cause of action. *Cote v. Dep't of Human Servs.*, 2003 ME 146, ¶ 3 n.1, 837 A.2d 140; *Forbes v. Wells Beach Casino, Inc.*, 409 A.2d 646, 655-56 (Me. 1979) (stating that there is a difference between "fraud that will vitiate a contract and fraud that is actionable as deceit"). Therefore, Flynn is not entitled to any damages on his counterclaim for fraud in the inducement.

This Order has already analyzed Flynn's fraud in the inducement claim and concluded that neither the MOA nor the SA is void or voidable for fraud in the inducement. *See* Section III(A)(3), *supra* at 14-17. For all the reasons previously discussed—the lack of evidence of fraudulent intent, the lack of any reference to O/A except in an attachment to the MOA, the fact that Flynn's conversations with Heisler and Getchell are superseded by the fully integrated MOA and the SA—Flynn has no valid fraudulent inducement claim against TH as to either the MOA or the SA.

Where appropriate, the court may enter summary judgment against the moving party. M.R. Civ. P. 56(c). Because there is no genuine issue of fact and Flynn's counterclaim for fraud in the inducement fails as a matter of law, summary judgment shall be granted for TH on Flynn's counterclaim for fraud in the inducement.

2.    Breach of the SA or corporate bylaws

As discussed above, because there is no indication that every promise in the SA was consideration for every promise in the MOA or vice versa, the MOA and the SA constitute separate, distinct agreements. Therefore, any breach of the SA by TH does not vitiate Flynn's obligation under the MOA. *See* Restatement (Second) of Contracts § 231 cmt. d.

27

As set forth above, to obtain damages for his breach of contract counterclaim, Flynn must establish: (1) the parties had a legally binding contract; (2) the defendant breached a material term of the contract; and (3) defendant's breach caused the plaintiff to suffer damages. *Tobin*, 2014 ME 51, ¶¶ 9-10, 89 A.3d 1088. The interpretation of an unambiguous contract is a question of law for the court. *Thayer Corp.*, 675 A.2d at 516. If a contract is unambiguous, the court must give the contract terms their plain, ordinary, and generally accepted meaning. *Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457. The determination of whether a contract is ambiguous is a question of law for the court. *Thayer Corp.*, 675 A.2d at 516. "Contract language is ambiguous when it is reasonably susceptible to different interpretations." *Id.* (internal quotation omitted). The court may consider extrinsic evidence to determine the parties' intent, only if a contract is found to be ambiguous. *Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457. Corporate bylaws are interpreted using the same rules of construction as a contract. *Lee*, 2003 ME 78, ¶¶ 9-10, 828 A.2d 210.

Foremost, Flynn asserts that TH breached its corporate bylaws by failing to pay him his capital share within 90 days of his departure. (Flynn Mot. Summ. J. 10.) There is no dispute that Flynn officially resigned from TH on January 31, 2009. (Flynn Supp'g S.M.F. ¶ 15, Ex. 1; TH Opp. S.M.F. ¶ 15.) Flynn received a check for the value of his capital share on June 23, 2009, 143 days following his resignation. (Flynn Supp'g S.M.F. ¶ 22; TH Opp. S.M.F. ¶ 22.) Section 14(a) of TH's corporate bylaws provide, in relevant part:

a. <u>Stock Redemption and Valuation</u>. Subject to the provisions of subsection (e), the stock of the departing director shall be redeemed by the corporation within ninety (90) days of departure ...

(Flynn Ex. 9.)

However, the SA entered into by Flynn and TH on January 31, 2009, unambiguously states:

28

2.     In exchange for JPF endorsing his stock certificates to TH, TH will deliver to JPF his share of the firm's capital as of January 1, 2009 **when the amount of the firm's capital as of that date is determined.**

(Flynn Ex. 1.) (emphasis supplied). As previously discussed, the SA's unambiguous integration clause provides that the SA "contains the entire agreement between TH and JPF in connection with topics set forth herein, and **supersedes all prior agreements** and negotiations between the parties." (*Id.*) (emphasis supplied). Therefore, the terms of the SA regarding payment of Flynn's capital share supersede the bylaws with regard to when payment would be made. Flynn has put forth no facts demonstrating that he was not paid when the amount of the firm's capital share as of January 1, 2009 was determined. Therefore, TH's failure to pay him the value of his capital share within ninety days was not breach of a material term of the agreements between Flynn and TH.

To the extent Flynn may also be arguing that TH breached the MOA and/or SA agreements by failing to pay him O/A fees for the cases that left TH with Flynn, TH's failure to pay Flynn O/A fees does not constitute a breach of a material term. As discussed above, both the SA and the MOA are silent as to O/A fees. (Flynn Exs. 1-2.) The SA's unambiguous integration clause states that the SA and the MOA contains the entire agreement between TH and Flynn and "**supersedes all prior agreements** and negotiations." (*Id.* Ex. 1) (emphasis supplied). Moreover, § 14(d) of TH's corporate bylaws unambiguously states that a departing director engaged in the private practice of law and in competition with TH, as determined by TH, is not entitled to O/A fees. (TH Opp. S.M.F. Ex. D.) There is no genuine dispute that Flynn has remained engaged in the private practice of law and in competition with TH. (TH Supp'g S.M.F. *Braley* ¶¶ 23-24, *Paige* ¶¶ 23-24, *Nickerson* ¶¶ 23-24.) Thus, Flynn is not entitled to O/A fees under the corporate bylaws. Because the unambiguous terms of the SA,

29

the MOA, and TH's bylaws preclude Flynn from receiving O/A fees, TH's failure to pay O/A fees does not constitute a breach of a material term.

Where appropriate, the court may enter summary judgment against the moving party. M.R. Civ. P. 56(c). Because TH's failure to pay Flynn the value of his capital share within ninety days or O/A fees does not constitute a breach of a material term as a matter of law, TH is entitled to summary judgment in its favor on Flynn's claim for breach of contract as to those issues.

Lastly, Flynn asserts that TH breached the SA by failing to pay him the full value of his capital share. (Flynn Mot. Summ. J. 10.) On June 23, 2009, Flynn received a check for the value of his capital share in the amount of $21,655.00. (Flynn Supp'g S.M.F. ¶ 22; TH Opp. S.M.F. ¶ 22.) Flynn asserts that TH improperly reduced his capital share by treating the unreimbursed disbursements owed to TH by clients who left TH with Flynn as unrecoverable and subtracting Flynn's share of those expenses from his capital share. (Flynn Supp'g S.M.F. ¶ 25.) Flynn asserts that TH has never employed this practice when reimbursing previous departing directors and that he had never agreed to this method for calculating the value of his capital share. (*Id.* ¶¶ 27, 29.) TH asserts that it properly reduced Flynn's capital share in accordance with the SRA and the firm's bylaws. (TH Opp'n Mot. Summ. J. 11.)

On August 3, 2010, TH paid Flynn an additional $2,201.78 as his share of repaid disbursements that were previously deducted from his capital share. (TH Supp'g S.M.F. *Braley* ¶ 21, *Paige* ¶ 21, *Nickerson* ¶ 21.) Thus, Flynn has been paid a total of $23,856.78 for his capital share. Flynn still asserts that if the unreimbursed disbursements from the cases that left were added back into TH's capital, Flynn's correct capital share would have been $30,838.16. (Flynn Mot. Summ. J. 15.) Thus, Flynn asserts he is entitled to an additional $6,981.38 from TH for his capital share. TH asserts that, if the unreimbursed disbursements were added back

into the TH's capital, Flynn's capital share would have been only $26,192.19, and Flynn would be entitled to, at the most, $2,335.41 on his breach of contract counterclaim. (TH Supp'g S.M.F. *Braley* ¶ 22, *Paige* ¶ 22, *Nickerson* ¶ 22.)

The SA is silent as to how the value of Flynn's capital share would be determined. The SA simply states, "TH will deliver to JPF his share of the firm's capital as of January 1, 2009 when the amount of the firm's capital as of that date is determined." (Flynn Ex. 1.) TH's SRA entered into by Flynn and the firm's other shareholders and its corporate bylaws unambiguously state how the value of a departing director's capital share shall be determined. TH's SRA states, in relevant part:

> This Agreement is entered into effective January 1, 2008 by and among Troubh Heisler, P.A. ("the Firm") and each of its shareholders, **for the purpose of defining the terms and manner by which the Firm shall redeem the stock of any shareholder.** The parties hereto agree as follows:
> ...
> 4. Upon a shareholder's death, departure, or resignation from the Firm, the Firm's accountants shall determine the amount of the Firm's existing capital. The Firm's Capital Account shall be equal to the net book value of the Firm as shown on its tax return for its calendar year immediately prior to the departure date, reduced for any estimated departure year loss expected to be realized for that year.
>
> 5. The departing shareholder's stock shall be redeemed in an amount equal to a percentage of the Firm's Capital Account that is the same percentage the departing shareholder's Paid-In Capital bears to the aggregate amount of Paid-In Capital of all remaining shareholders, including the departing shareholder.
> ...
> 7. **This agreement is subject to the terms and limitations set forth in paragraph 14 of the Firm's Bylaws.**

(TH Opp. S.M.F. Ex. E) (emphasis supplied). Paragraph 14(e) of TH's corporate bylaws unambiguously states in relevant part:

> e. <u>Reduction and Aggregate Limitation.</u> Any amounts due to a departing director under these by-laws or under any separate Compensation Agreement, Stock Redemption Agreement, or other contract, **are subject to reduction** for excess base salary pursuant to Paragraph 10 Subparagraph b of

31

> these by-laws, or **for any other amounts due and owing to the corporation at the date of departure.**

(TH Opp. S.M.F. Ex. D) (emphasis supplied). Thus, the unambiguous terms of TH's corporate bylaws expressly permitted TH to reduce a departing director's capital share by any amounts due and owing the firm at the date of departure. Because these terms are unambiguous, the court need not consider Flynn's extrinsic evidence about TH's prior actions towards other departing directors. *See Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457. The unambiguous terms on the SRA and bylaws permitted TH to reduce Flynn's capital share. Thus, Flynn is not entitled to summary judgment on his breach of contract counterclaims simply because TH reduced his capital share.

However, this does not mean that TH is entitled to summary judgment in its favor on Flynn's breach of contract counterclaims for failure to pay Flynn the full value of his capital share. There is still a genuine dispute between TH and Flynn regarding whether TH properly characterized the unreimbursed costs as amounts owed and due to the firm at the time of Flynn's departure. Furthermore, even if the court were to find as a matter law that TH's failure to pay the full value of Flynn's capital share was a breach of contract, there would still be a genuine dispute as to damages. Flynn asserts the correct value of his capital share was $30,838.16, meaning he is owed $6,981.38. TH, on the other hand, asserts that Flynn's capital share would be worth $26,192.19, meaning Flynn would be entitled to only $2,335.41. These genuine disputes of material fact preclude the court from entering summary judgment.

At oral argument, counsel for TH represented to the court that, if TH obtained summary judgment on its claims for portions of the *Braley, Paige,* and *Nickerson* fees, TH would not contest Flynn's counterclaim regarding the reduction in his capital share. As discussed above, the court shall grant summary judgment for TH on its claims against Flynn and the Lilley firm for portions of the *Braley, Paige,* and *Nickerson* fees. The court encourages TH and

32

Flynn to meet and confer as to an agreed upon value in order to resolve Flynn's claim regarding the reduction of his capital share.

### 3. Flynn's counterclaim for unjust enrichment

Though Flynn's motion purports to seek summary judgment on all of Flynn's counterclaims against TH, Flynn's motion fails to address his claim for unjust enrichment. (Flynn. Mot. Summ. J. 2.) However, there is no dispute that, as a matter of law, Flynn is not entitled to any relief under a theory of unjust enrichment. "The remedy of unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship,..." *Nadeau v. Pitman*, 1999 ME 104, ¶ 14, 731 A.2d 863 (internal quotation omitted). "The existence of a contractual relationship, precludes recovery on a theory of unjust enrichment." *Id.* (internal quotation omitted).

Because there is no dispute that a valid and enforceable agreement between TH and Flynn exists, Flynn is precluded from recovery on a theory of unjust enrichment. Therefore, the court shall grant summary judgment in favor of TH on Flynn's counterclaim for unjust enrichment. *See* M.R. Civ. P. 56(c).

Accordingly, Flynn's motion for summary judgment on his counterclaims against TH shall be denied. Pursuant to Maine Rule of Civil Procedure 56(c), partial summary judgment shall be granted for TH on the following: (1) Flynn's counterclaim for fraud in the inducement; (2) Flynn's counterclaim for breach of contract for failing to pay Flynn his capital share within ninety days or O/A fees; and (3) Flynn's counterclaim for unjust enrichment. Flynn's counterclaim for breach of contract against TH for failure to pay the full value of Flynn's capital share remains pending.

E.    Flynn's Motion for Summary Judgment Against the Lilley Parties

Flynn has moved for summary judgment on (1) the Lilley parties' claims against him for the *Braley, Paige,* and *Nickerson* fees and (2) his counterclaims against the Lilley parties for fraud. Regarding the Lilley parties' claims for portions of the fees, Flynn asserts that the MOU is an enforceable and unambiguous contract between Flynn and the Lilley parties that governs the Lilley parties' entitlement to any portion of attorney's fees from Flynn's Original Cases. (Flynn Mot. Summ. J. 2.) Flynn asserts the Lilley parties have failed to put forth evidence demonstrating their entitlement to portions of the attorney's fees under the Original Cases provision of the MOU. (*Id.* at 3-4.) Regarding his claims for fraud, Flynn asserts the Lilley parties induced him to enter into the MOU with fraudulent promises to pay him bonuses. (*Id.* at 8-9.) Flynn also asserts that the Lilley parties misrepresented the firm's financial situation to induce Flynn to agree to reduce his salary. (*Id.* at 6-7.)

In opposition to Flynn's motion for summary judgment on the Lilley parties' claims to the fees, the Lilley parties assert (1) that the Original Cases terms of the MOU are unenforceable for indefiniteness and lack of mutual assent, and (2) that there are genuine issues of material fact regarding the amount of assistance the Lilley firm provided to Flynn on his Original Cases. (Lilley Opp'n Mot. Summ. J. 5-13.) Regarding Flynn's claims for fraud, the Lilley parties assert that Flynn's claims for fraud in the inducement are an affirmative defense to contract formation and do not state a claim for damages. (*Id.* at 13.)

1.    The MOU is not unenforceable for indefiniteness or lack of mutual assent.

The Lilley parties argue that the Original Cases provision of the MOU is indefinite because it lacks a key term: the numerical percentage owed to the Lilley firm as compensation for its assistance, resources, and support for Flynn's Original Cases that Flynn brought with him from TH to the Lilley firm. (*Id.* at 10-12.)

"To be binding, an agreement must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties." *Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903 (internal quotation omitted). "[M]issing or indefinite essential terms may, in certain cases, preclude a reasonably calculable remedy or indicate a lack of contractual intent so as to render an agreement unenforceable,..." *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 19, 983 A.2d 382. However, "courts should be reluctant to construe a contract so as to render it unenforceable if that result can be avoided." *Id.* (internal quotation omitted). "Lack of a key term is not necessarily fatal to the enforcement of a contract, as long as the missing term does not indicate a lack of contractual intent." *Pelletier*, 2012 ME 15, ¶ 15, 36 A.3d 903. "If a contract leaves open a key term, the law invokes the standard of reasonableness, and courts will supply the needed term." *Fitzgerald*, 2009 ME 115, ¶ 19, 983 A.2d 382 (internal quotation omitted). Furthermore, "[a]n offer which appears to be indefinite may be given precision by usage of trade or course of dealing between the parties." *Id.* (internal quotation omitted). The meaning of uncertain terms is a question of fact within the province of the fact finder. *Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903.

The Original Cases provision of the MOU states in relevant part:

> As compensation for the assistance, resources and staff support from Daniel G. Lilley Law Office in the continuing representation by Mr. Flynn in such cases described above, the parties agree that a percentage of the attorneys' fees payable to Mr. Flynn, shall be payable to the Daniel G. Lilley Law Office.

(Flynn Supp'g S.M.F. Ex. 1). In *Fitzgerald v. Hutchins*, our Law Court held that "the lack of a stated percentage for commission does not render [a contract] unenforceable." 2009 ME 115, ¶ 19, 983 A.2d 382. Similarly here, the fact that the MOU explicitly provides that the percentage payable to the Lilley firm for each case is to compensate the firm for its "assistance, resources and staff support" provided means that the amount of compensation can be quantified as a percentage of the fee.

2. The existence of ambiguous terms in the MOU precludes summary judgment on Lilley's claims for the *Braley, Paige,* and *Nickerson* fees.

Whether a contract is ambiguous is a question of law for the court. *Thayer Corp.,* 675 A.2d at 516. "Contract language is ambiguous when it is reasonably susceptible to different interpretations." *Id.* (internal quotation omitted). The court may consider extrinsic evidence to determine the parties' intent only if the contract is found to be ambiguous. *Garrity,* 2000 ME 48, ¶ 10, 748 A.2d 457. The interpretation of an unambiguous contract is a question of law for the court. *Thayer Corp.,* 675 A.2d at 516. If a contract is unambiguous, the court must give the contract terms their plain, ordinary, and generally accepted meaning. *Garrity,* 2000 ME 48, ¶ 9, 748 A.2d 457.

Flynn asserts that the language of the MOU is unambiguous and that the Lilley parties must demonstrate what specific "assistance, resources, and staff support" the firm provided in order to establish a claim to "any percentage" of the fees generated in the *Braley, Paige,* and *Nickerson* matters. (Flynn. Mot. Summ. J. 2.) Flynn asserts that Lilley's "assistance, resources, and staff support" in the three cases was limited to litigation expenses for which the Lilley firm has already been reimbursed. (*Id.* at 3-6; Flynn Supp'g S.M.F. ¶¶ 4-7.) Thus, according to Flynn, Lilley is entitled to no percentage under the terms of the MOU. In opposition, the Lilley parties assert the firm provided considerable "assistance, resources and staff support" to Flynn in the form of salary, benefits, secretary and paralegal assistance, guidance, the payment of costs, and the absorption of losses from unsuccessful cases. (Lilley Opp'n Mot. Summ. J. 12; Lilley Add'l S.M.F. ¶¶ 1-3, 7-9.)

The Original Cases provision of the MOU clearly and unambiguously states that the Lilley parties are entitled to a percentage of the fees from Flynn's Original Cases as "compensation" for the firm's "assistance, resources, and staff support" in those cases. The Lilley parties are not entitled to a percentage based on the total fee received by Flynn. Thus,

36

the total fee received by Flynn and Lilley's knowledge, or lack thereof, of any fees promised by Flynn to other parties are irrelevant. Under the plain terms of the Original Cases provision of the MOU, the Lilley parties' "percentage" is based on the amount of "assistance, resources, and staff support" provided by the firm. The Original Cases provision of the MOU, however, is silent as to what constitutes "assistance, resources, and staff support" and the "percentage" to be derived therefrom. What the parties meant by those terms remains ambiguous and must be resolved at trial.

Moreover, the parties' statements of material facts demonstrate there is a genuine dispute of fact between Flynn and the Lilley parties regarding the kind and amount of "assistance, resources, and staff support" provided by the Lilley firm. Accordingly, Flynn's motion for summary judgment on the Lilley parties' claim for "a percentage" of the *Braley, Paige,* and *Nickerson* fees must be denied.

3.  Flynn's claim that the Lilley parties committed fraud by falsely promising to pay Flynn bonuses fails.

As discussed above, fraud in the inducement is an affirmative defense for the purpose of justifying the avoidance or rescission of a contract, which is distinguishable from the tort of fraud. *Cote,* 2003 ME 146, ¶ 3 n.1, 837 A.2d 140; *Forbes,* 409 A.2d at 655-56.

Although Flynn has labeled Count II of his counterclaim "fraud in the inducement," it appears that Flynn is not actually advancing an affirmative defense. In his counterclaim, Flynn asserts, "As a direct and consequential result of the failure of Daniel G. Lilley and the Lilley office to honor and adhere to their representations and promises, Flynn has suffered lost income and interest, loss of economic opportunity [and] incurred tax penalties." (Flynn Countercl. ¶ 130.) Flynn requests that the court "award just and reasonable damages" for his "fraud in the inducement" claim. (*Id.* at 29.) Flynn's motion for summary judgment further demonstrates that Flynn is not seeking to avoid or rescind the MOU. Flynn expressly states

37

that the MOU is an enforceable agreement between him and the Lilley parties. (Flynn Mot. Summ. J. 1-3; Flynn Supp'g S.M.F. ¶ 1.) Therefore, although Flynn has labeled his claim "fraud in the inducement," it is clear that Flynn's claim is actually one for the tort of fraud.

To obtain damages for fraud, a plaintiff must prove by clear and convincing evidence that (1) the defendant made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of its truth or falsity; (4) for the purpose of inducing the plaintiff to act in reliance upon it; and (5) the plaintiff justifiably relied upon the fact as true to their detriment. *Me. Eye Care Assocs., P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707.

With regard to the Lilley parties' promise to pay Flynn bonuses, Flynn has failed to show that Lilley knowingly made false representations regarding his intent to pay Flynn bonuses. The MOU states, in relevant part:

> In addition to the base salary, Mr. Flynn shall also be entitled to payment of bonuses based upon results generated. Such bonuses shall be payable at the conclusion of the case after funds are distributed and the amount of said bonuses shall be at the sole discretion of Daniel G. Lilley Law Office.

(Flynn Supp'g S.M.F. Ex. 1.) Flynn asserts that, while employed by the Lilley firm, he obtained a successful resolution in multiple "Lilley-originated cases" and generated nearly $1,000,000.00 in attorney's fees for the firm. (Flynn Supp'g S.M.F. ¶ 22.) Flynn asserts that Lilley never paid Flynn a single bonus at the conclusion of any "Lilley-originated case." (*Id.* ¶ 17.) Flynn asserts that Lilley has testified under oath that his decision of whether to pay Flynn a bonus was based on additional criteria: (1) whether the firm's finances permitted it; (2) whether the results generated were "extraordinary;" and (3) his consideration of other cases that were lost and other financial considerations. (*Id.* ¶¶ 17-19.) Flynn asserts that he viewed the promise of bonuses as a substantial benefit and relied on that promise when accepting Lilley's offer of employment. (*Id.* ¶¶ 20-21.)

While these facts demonstrate Flynn never received a bonus, none of these facts show that Lilley knowingly or recklessly made a false representation regarding his intent to pay bonuses in order to deceive Flynn. Therefore, Flynn is not entitled to summary judgment on his fraud claim against the Lilley parties for failing to pay Flynn bonuses. Because Flynn's fraud claim for failing to pay bonuses fails, the Lilley parties are entitled to summary judgment in their favor on that issue. *See* M.R. Civ. P. 56(c).

4. <u>There are genuine issues of material fact regarding Flynn's claim that the Lilley parties committed fraud by misrepresenting the financial state of the firm.</u>

As stated above, Flynn's claim for "fraud in the inducement" against Lilley is actually a tort claim for fraud. Flynn asserts that, in May 2009, he agreed to temporarily reduce his salary from $115,000.00 per year as provided in the MOU because Lilley told him that the firm was experiencing financial hardship. (Flynn Supp'g S.M.F. ¶¶ 9-10.) Flynn asserts the Lilley firm's profits and losses statements for 2009-2011 demonstrate that the firm had the financial wherewithal to pay Flynn his full agreed upon salary. (Flynn Supp'g S.M.F. ¶¶ 11-15.) In opposition, the Lilley parties cite to Lilley's prior testimony regarding the financial difficulties of the firm. (Lilley Opp. S.M.F. ¶¶ 10-11.)

Based on the above evidence, there are genuine issues of material fact regarding whether the Lilley parties knowingly or recklessly made material misrepresentations of fact regarding the financial situation of the firm. Therefore, Flynn's motion for summary judgment on his fraud claim against the Lilley parties regarding the reduction of his salary must be denied.[6] His claim will go to trial.

---

[6] Though the court has construed Flynn's "fraud in the inducement" claim against Lilley with respect to his salary as a tort claim, Flynn may still be able to assert an actual claim for fraud in the inducement if he wishes to avoid the alleged agreement between him and the Lilley parties to modify his salary rather than to seek damages. The distinction, however, may be one without a difference.

Therefore, Flynn's motion for summary judgment on the Lilley parties' claim for the *Braley, Paige*, and *Nickerson* fees shall be denied. Flynn's motion for summary judgment on his counterclaims for fraud against the Lilley parties shall also be denied. Pursuant to Maine Rule of Civil Procedure 56(c), summary judgment is granted in favor of the Lilley parties on Flynn's fraud claim for failing to pay Flynn bonuses. Flynn's fraud claim against the Lilley parties regarding the reduction of his salary remains pending.

### IV. Conclusion

It is hereby ORDERED AND ADJUDGED AS FOLLOWS:

(1)     Troubh Heisler, P.A.'s motion for summary judgment on its breach of contract claims against John P. Flynn, III, Esq. and Daniel G. Lilley, P.A., is granted. Troubh Heisler, P.A. is entitled to judgment in the following amounts: (1) $248,000.00 for the *Braley* matter, (2) $57,059.25 for the *Paige* matter, (3) $15,725.00 for the *Nickerson* matter, plus interest on each.

(2)     Troubh Heisler, P.A.'s motion for summary judgment as to the claim of James P. Howaniec, Esq. for the *Paige* matter is denied.

(3)     Richard D. Tucker, Esq. and the Tucker Law Group's motion for summary judgment on its claims against Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A. is denied.

(4)     John P. Flynn, III, Esq.'s motion for summary judgment on his counterclaims against Troubh Heisler, P.A. is denied.

(5)     Pursuant to Maine Rule of Civil Procedure 56(c), partial summary judgment is granted for Troubh Heisler, P.A. on following: (1) John P. Flynn, III, Esq.'s counterclaim for fraud in the inducement; (2) John P. Flynn, III, Esq.'s counterclaim for breach of contract for failing to pay Flynn his capital share within ninety days or O/A fees; and (3) John P. Flynn, III, Esq.'s counterclaim for unjust enrichment. John P. Flynn, III, Esq.'s counterclaim for breach of contract against Troubh Heisler, P.A. for failure to pay the full value of Flynn's capital share

40

remains pending. The court encourages Troubh Heisler, P.A. and John P. Flynn, III, Esq. to meet and confer as to an agreed upon value in order to resolve Flynn's breach of contract counterclaim prior to trial.

(6)     John P. Flynn, III, Esq.'s motion for summary judgment on Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A.'s claim for the *Braley*, *Paige*, and *Nickerson* fees is denied.

(7)     John P. Flynn, III, Esq.'s motion for summary judgment on his counterclaims against Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A. is denied.

(8)     Pursuant to Maine Rule of Civil Procedure 56(c), summary judgment is granted in favor of Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A. on John P. Flynn, III's fraud claim for failing to pay Flynn bonuses. John P. Flynn, III's fraud claim against Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A. regarding the reduction of his salary remains pending.

(9)     The court and the parties shall confer and determine the remaining issues for trial at the forthcoming pre-trial conference scheduled for March 8th, 2017, at 2:30 p.m.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated March 1, 2017

A.M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 3-1-17
Copies sent via Mail __ Electronically __

41

**In Re SIX CONSOLIDATED CASES
INVLOLVING FLYNN, HOWANIEC, LILLEY
TUCKER and TROUGH HEISLER PARTIES**

**BCD-CV-2015-41**

John P. Flynn, Esq.                          John Flynn, III, Esq.
                                             35 Carin Hill Road
                                             Bowdoinham, ME 04008

James P. Howaniec, Esq.                      Scott Lynch, Esq.
                                             261 Ash Street
                                             Lewiston, ME 04243

                                             Walter McKee, Esq.
Daniel G. Lilley, Esq.                       133 State Street
                                             Augusta, ME  04330

                                             Julian Sweet, Esq.
Richard D. Tucker, Esq.                      129 Lisbon Street
                                             Lewiston, ME 04243

                                             Gerald Petruccelli, Esq.
Troubh Heisler firm                          2 Monument Square, Suite 900
                                             Portland, ME 04112

In Re SIX CONSOLIDATED CASES
INVOLVING FLYNN, HOWANIEC, LILLEY                Docket Nos. BCD-CV-15-41 et seq.
TUCKER and TROUBH HEISLER PARTIES

## ORDER ON MOTIONS FOR CONTEMPT
## AND MOTION TO SEAL

Attorney John Flynn, III ["Flynn"] has filed a Motion for Contempt against two other parties, Daniel G. Lilley and Daniel G. Lilley, P.A. [hereafter collectively "the Lilley parties"] for violating discovery orders in this case. Attorney Flynn also filed a Motion to Compel which, to the extent it is directed against the Lilley parties is unnecessary because the Lilley parties have already been compelled to produce the material at issue.

The Lilley parties have also filed a Motion for Contempt against attorney Flynn, based on his acknowledged violation of the Confidentiality Order in this case. With their contempt motion, they filed a Motion to Immediately Seal attorney Flynn's summary judgment motion and exhibits.

Oral argument on the Motions was held January 5, 2017.

*Attorney Flynn's Motion for Contempt*

Attorney Flynn's Motion for Contempt is based on the Lilley parties' failure to comply with multiple court orders, beginning in August 2016. The materials at issue include the Lilley parties' tax returns; a case list of all cases in the Lilley law firm during attorney Flynn's time there, and a complete copy of the case files for those cases, as well as attorney Lilley's calendars for the years during which attorney Flynn was at the Lilley firm.

The tax returns were ordered produced because, during the jury trial in one of these consolidated cases, attorney Lilley testified that he decided not to pay attorney Flynn a bonus

1

based in part on the financial circumstances of the Lilley law firm, thereby putting the finances of the Lilley firm into legitimate issue for discovery purposes.

The case files, case list and calendars are discoverable because attorney Lilley and attorney Flynn disagree about how much time and effort each of them contributed to the cases that were handled by the Lilley law firm while attorney Flynn worked there.

Not until attorney Flynn filed his motion for contempt did the Lilley parties produce tax returns for the Lilley law firm. Attorney Lilley's personal tax returns have yet to be produced, because it turns out that they were filed jointly with his wife, Annette Lilley. However, redacted versions of portions of the returns have been filed in the context of Annette Lilley's motion for protective order, and after review, the court is in agreement with Annette Lilley's position that they need not be, and should not be, disclosed further.

There appears to be no dispute that the Lilley parties failed to obey the orders dated August 3, August 12 and November 9, 2016. Also, there appears to be no doubt that the disobedience was intentional for purposes of M.R. Civ. P. 66, which requires the moving party on a contempt motion to show by clear and convincing evidence that the court orders at issue were violated, and that the violator had the ability to comply.

Accordingly, the court concludes that attorney Flynn has proved that the Lilley parties were in contempt of the court's discovery orders.

This is a remedial contempt proceeding, so any contempt sanctions must be coercive or compensatory in nature, not punitive in nature. *See Land Use Regulation Commission v. Tuck*, 490 A.2d 649, 652 (Me. 1984). In his motion, attorney Flynn requests a variety of sanctions, including a finding of contempt, sanctions including default and dismissal of claims, attorney fees, and an extension of the dispositive motion deadline.

This order does include a contempt finding, but the court declines to award the other sanctions requested, other than a potential preclusion of evidence should the violation not be terminated and a coercive financial sanction.

First, on the present record, the court is not persuaded that a default or dismissal of claims is warranted.

Second, although the months of delay in producing documents could justify an award of attorney fees against the Lilley parties, attorney Flynn is proceeding pro se and presumably has not incurred any attorney fees payable to another attorney. Whether a pro se attorney is entitled to an award of attorney fees appears to be an open question in Maine, but the weight of authority elsewhere appears to be against such an award. *See, e.g., Kay v. Ehrler*, 900 F.2d 967, 970-72 (6th Cir. 1990); *McReady v. Department of Consumer & Regulatory Affairs*, 618 A.2d 609, 612-13 (D.C. App. 1992). The reason is that an attorney fee, by definition, implies a fee charged by an attorney to a client. There is a counterargument based on the lost opportunity costs to the pro se attorney, but this has not prevailed in most instances, according to the court's research. If attorney Flynn in fact incurred any attorney fees or any other expense as a result of the Lilley parties' violation of these orders, or if he can point to Maine authority for an award, he may request reconsideration.

The court has considered whether to impose a fine in lieu of attorney fees, but "[a] civil contempt fine must either compensate the party intended to be benefitted by the original court order for losses sustained or, by its conditional nature, work to coerce the contemnor to comply with the court's order." *See Land Use Regulation Commission v. Tuck, supra*, 490 A.2d at 652. Although attorney Flynn asserts that the Lilley parties' violation of discovery orders has deprived him of the opportunity to move for summary judgment, this does not translate into any dollar amount for purposes of compensation. Also, as noted at oral argument, the materials

3

at issue seem less relevant to any issue of law than to disputed factual issues for trial and to impeachment.

As to coercive sanctions, none would be necessary or appropriate if the Lilley parties were in full compliance with the discovery orders at issue. However, whether they are in full compliance, even now, is not clear. In their December 20, 2016 objection to attorney Flynn's contempt motion, the Lilley parties stated: "The documents requested by Flynn have now been provided with the only exception being the personal tax returns of Daniel G. Lilley which are the subject of a discovery dispute concerning Daniel G. Lilley's wife Annette." Objection ¶ 3 (Dec. 20, 2016). At the January 5 oral argument, it emerged that this representation was not entirely accurate. This troubling development leaves the court uncertain as to whether the Lilley parties have, in fact, even now, provided all of the discovery they have been ordered to provide. These cases are set for a two-week jury trial beginning in April 2017. As the trial dates approach, any continuing noncompliance with discovery becomes very problematic.

Accordingly, this order sets a deadline for the Lilley parties to certify full compliance and imposes coercive sanctions if the deadline is not met.

*The Lilley Parties' Motion for Contempt*

The Lilley Parties' Motion for Contempt against attorney Flynn is based on attorney Flynn's acknowledged violation of the Confidentiality Order in this case, by virtue of his including designated confidential material in a filing without following the procedure required by the Confidentiality Order. There appears to be no doubt that the violation was intentional, in the sense that attorney Flynn had the ability to avoid the violation for purposes of M.R. Civ. P. 66, which requires the moving party on a contempt motion to show by clear and convincing evidence that the court orders at issue were violated, and that the violator had the ability to comply.

4

Accordingly, the court concludes that the Lilley parties have proved that attorney Flynn violated in the confidentiality order. However, because the violation is not a continuing one, there is no need for any coercive sanction. Violation of any confidentiality order is a serious matter, so a finding of contempt is warranted, although the court finds and concludes that no other sanction, including any award of attorney fees, is necessary or justified.

*The Lilley Parties' Motion to Seal*

The court grants the Lilley parties' motion to seal to the following extent. Attorney Flynn's motion for summary judgment, statement of material facts and the exhibits thereto will be sealed. However, attorney Flynn will be required to file a redacted version of the motion and statement of material facts, redacting only specific dollar figures derived from the confidential documents. The redacted version will be public. This result reflects the court's effort to honor legitimate confidentiality concerns with its no less important duty of transparency as a public forum.

IT IS HEREBY ORDERED AS FOLLOWS:

1. The Lilley parties' Motion for Contempt is granted. For the reasons stated above, John Flynn, III, Esq. is adjudicated to be in contempt of the court's Confidentiality Order.

2. The Lilley parties' Motion to Immediately Seal is granted. The motion for summary judgment and related materials filed by attorney Flynn shall be sealed forthwith. Within 14 days, attorney Flynn shall file a redacted copy of the motion and memorandum of law and statement of material facts, redacting only the dollar figures contained in designated confidential documents, and not making any other changes to what was previously filed. The redacted documents shall be available for public inspection.

3. Attorney Flynn's Motion for Contempt is granted. For the reasons stated above, Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A. are hereby adjudicated to be in contempt of

5

the court's orders dated August 3, 2016, August 12, 2016, and November 9, 2016.    To assure

their full future compliance with said orders, it is hereby ORDERED:

a) Within seven days of electronic notice of this order to their attorney, Daniel G. Lilley, Esq. and Daniel G. Lilley, P.A. jointly and severally shall produce to attorney Flynn any and all materials not previously produced that are within the scope of the court's order to produce dated November 9, 2016, except that any personal tax returns filed by attorney Lilley jointly with Annette Lilley need not be produced.

b) Upon completing production of all such materials (other than joint personal tax returns) within the scope of the preceding subparagraph (a), the Lilley parties shall file with the court, subject to the provisions of M.R. Civ. P. 11, a certificate that they have fully complied with the preceding subparagraph (a).

c) If the certificate of full compliance referred to in the preceding subparagraph (b) is not filed with the court by January 27, 2017, a coercive financial sanction of $500 per day will be imposed on the Lilley parties for each day thereafter until the certificate of full compliance is filed.    The coercive financial sanction shall terminate upon the filing of the certificate of full compliance, except that, should the court later determine that the certificate of full compliance was not accurate, the $500/day sanction may be reinstated for the period between the filing of the certificate and the date on which full compliance in fact is determined to have occurred.    The terms of payment of any financial sanction shall be determined by further order.

d) If the Lilley parties are not in full compliance with this order by February 9, 2017, in addition to any financial sanction due, they will be precluded from presenting any evidence regarding the time spent and tasks performed by attorney Flynn on any case, including but not limited to the cases that generated the attorney fees at issue in these consolidated cases, and will be also precluded from presenting evidence in opposition to his claim for bonuses.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by

reference in the docket.

Dated January 17, 2017            /s_____

A. M. Horton, Justice

**In Re SIX CONSOLIDATED CASES INVLOLVING FLYNN, HOWANIEC, LILLEY TUCKER and TROUGH HEISLER PARTIES**

**BCD-CV-2015-41**

John P. Flynn, Esq.

John Flynn, III, Esq.
35 Carin Hill Road
Bowdoinham, ME 04008

James P. Howaniec, Esq.

Scott Lynch, Esq.
261 Ash Street
Lewiston, ME 04243

Daniel G. Lilley, Esq.

Walter McKee, Esq.
133 State Street
Augusta, ME 04330

Richard D. Tucker, Esq.

Julian Sweet, Esq.
129 Lisbon Street
Lewiston, ME 04243

Troubh Heisler firm

Gerald Petruccelli, Esq.
2 Monument Square, Suite 900
Portland, ME 04112